GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street
New York, New York 10004
(646) 964-9640
Jason L. Solotaroff
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

KAREN BARZMAN, PH.D,

                Plaintiff,        Dkt. No.  3:22-cv-00367 (TJM/ML)

      -against-                  **COMPLAINT**

STATE UNIVERSITY OF NEW YORK,      **JURY TRIAL DEMANDED**
DONALD NEIMAN, CELIA KLIN, ANDREW
BAKER, and NANCY UM,

                Defendants.

-------------------------------------------------------------------X

      Plaintiff Karen Barzman, Ph.D., by her attorneys Giskan Solotaroff & Anderson LLP, for her complaint against Defendants State University of New York ("SUNY") and several of its administrators at its Binghamton University ("Binghamton") campus, alleges as follows.

## NATURE OF THE ACTION

      1.      In this action, Dr. Barzman, a professor of Art History in Harpur College at Binghamton, asserts claims based on Defendants' violations of Title IX of the Education Amendments of 1972, and the New York State Human Rights Law.

      2.      Defendants' violations arise from Defendants' deliberate indifference over an extended period to Dr. Barzman's complaints of sex-based harassment and domestic violence

against the former chair of Art History at Binghamton, John Tagg. Tagg physically abused and terrorized Dr. Barzman during their personal relationship. Subsequently, continuing to the present, Tagg, along with his allies in the Art History Department, has continued his abusive treatment of Dr. Barzman through harassment and disparate treatment.

3. Dr. Barzman made repeated complaints about the treatment of her by Tagg and others to Binghamton administrators throughout the years and requested that they protect her from him.

4. As recently as 2021, Dr. Barzman repeatedly requested that Binghamton move her to a different department so that she would not have to continually deal with the harassment and abuse from Tagg and his allies. Even though Binghamton had routinely reassigned professors to different departments at their request, Binghamton again and again refused to reassign Dr. Barzman.

5. With no other options of escaping Tagg's abuse and that of his department allies, Dr. Barzman was forced to resign from her position at Binghamton, effective August 2022.

## THE PARTIES

6. Plaintiff Karen Barzman, Ph.D is domiciled in Chicago, Illinois.

7. Defendant State University of New York is New York State's public university system with its headquarters in Albany, New York. Binghamton University is a SUNY institution located in Binghamton, New York.

8. Defendant Donald Neiman is currently Binghamton's Provost and Vice President of Academic Affairs and is domiciled in the State of New York.

9. Defendant Celia Klin is the current Dean of Harpur College, Binghamton's liberal arts college of which the Art History Department is a part. Klin is domiciled in the State of New York.

10. Defendant Andrew Baker is the current Title IX Officer at Binghamton and is domiciled in the State of New York.

11. Defendant Nancy Um is currently Associate Dean of Harpur College and is domiciled in the State of New York.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the claims made under Title IX pursuant to 28 U.S.C. §1331.

13. This Court has jurisdiction over the claims made pursuant to the NYSHRL pursuant to 28 U.S.C. §1367.

14. Alternatively, the Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1332 by virtue of diversity of the parties and the amount in controversy exceeding $75,000.

15. Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b) as Defendant SUNY is located in this District.

16. This Court has personal jurisdiction over Defendant because it is established under the laws of New York State and operates its business in New York State.

## THE FACTS

A. <u>Dr. Barzman's Background</u>

17. Dr. Barzman received an undergraduate degree from New York University in Fine Arts and Classical Civilization, and a master's degree from Bryn Mawr College, and a Ph.D from the Johns Hopkins University, both in the History of Art.

18. Dr. Barzman worked at Binghamton University as a faculty member in the Art History Department in Harpur College beginning in 1999. Her specialty is the Italian Renaissance and Baroque.

19. Dr. Barzman was awarded full professor status in 2017.

20. Dr. Barzman was involved in a domestic relationship with John Tagg from September 1996 until May 2005. Tagg is currently Distinguished Professor in Binghamton's Art History Department.

21. During their relationship, Tagg was physically violent and emotionally abusive to Dr. Barzman. Tagg's acts of abuse included forcefully shoving and shaking Dr. Barzman, yelling at her, berating and body shaming her, throwing objects at her, and compelling her to her knees to perform menial and degrading tasks. On several occasions the police were called by neighbors who heard the abuse but Dr. Barzman, who was terrified of Tagg, would tell the police that everything was fine.

22. Dr. Barzman was teaching at Cornell University in the early years of her relationship with Tagg. In 1999, Tagg, who was then a full professor and chair of the Art History Department at Binghamton, arranged for Dr. Barzman to be hired at Binghamton.

23. Once Dr. Barzman joined the faculty of Tagg's department, he began abusing her at work as well, treating her in a demeaning and patronizing manner at faculty meetings and

encouraging other faculty members to treat her in the same way. Tagg became increasingly menacing in the workplace after Dr. Barzman ended their domestic relationship in 2005 and his department allies, in junior positions and obligated to him as chair for their job security, became more emboldened in their treatment of her. As a result, Dr. Barzman has been isolated in the Art History Department and treated differently and more negatively than other faculty members.

24. The difference of treatment included Dr. Barzman being ignored, criticized, or ridiculed at department events, from faculty meetings to department social occasions. Specific examples of this treatment include the following:

25. During the academic year 2016-2017, Dr. Barzman was considered for promotion to full professor. In December 2016, Tom McDonough, who was Chair of Art History at the time and also Chair of the department's personnel committee handling Dr. Barzman's promotion case, came to Dr. Barzman's house unannounced at night to present her with a "survey report" submitted by the Art History Graduate Student Union. This "survey report" consisted of false and defaming accusations, including assertions that Dr. Barzman was racist and xenophobic and habitually derelict in her teaching responsibilities. At the time, the Art History Graduate Student Union was dominated by students working with Tagg and his department allies, including McDonough. On information and belief, the source of which is Dr. Barzman's familiarity with the way the Art History Department operates, these students would not have made these false statements and defamed Dr. Barzman without Tagg's malicious encouragement and that of his department allies.

26. Meanwhile, the personnel committee failed to contact most of the students who Dr. Barzman had identified as having taken multiple courses with her and having her supervise or serve on their M.A. and Ph.D dissertation committees, and did not cite any of the supportive

letters that had come from the few former students of Dr. Barzman who had been contacted. Dr. Barzman was eventually promoted to Full Professor but was required to address these defamatory accusations as part of the promotion process, and the defamatory graduate student "survey report" has remained part of her permanent personnel record.

27. This process, including the intimidation of the nighttime visit, and the marshaling of false negative statements along with the failure to seek input from students with favorable opinions had no counterpart in the promotion cases of any other department faculty in the twenty-two years Dr. Barzman has been at Binghamton.

28. Dr. Barzman was habitually excluded from professional training that would have advanced her teaching and her career as a scholar. This was particularly true in the emerging field of "digital humanities." In January 2019, Defendant Nancy Um, who was then Chair of the Art History Department and is now Associate Dean of Harpur College, announced that she would be conducting Binghamton's first "Digital Humanities Research Institute," which offered intensive training for faculty members in this new area of scholarship. Digital humanities research was highly relevant to Dr. Barzman's teaching and research, and she was eager to receive this training. Dr. Barzman was, however, fearful that Um would exclude her from the program in that Um had been among the Art History faculty who had been most hostile and abusive toward her, with a documented history of excluding Dr. Barzman from doctoral committees when Um served as Art History's Director of Graduate Studies (DGS).

29. Dr. Barzman nonetheless expressed her high level of interest in and qualifications for the program to Um both informally and in a formal application. Even though Dr. Barzman's candidacy for the program was stronger than other applicants both in terms of her qualifications and the program's relevance to her research, on March 22, 2019, Um rejected Dr. Barzman's

application and Dr. Barzman was prevented from participating in the program. Um continued to exclude Dr. Barzman from "digital humanities" training programs on campus, which were publicized by word of mouth among Um's campus cohort.

30. Dr. Barzman's marginalization and erasure by Tagg and his allies in the department took many forms, including cutting off communication regarding departmental matters and refusing to share important information regarding classroom teaching and instruction. From January 2019 to July of 2020, Dr. Barzman was away from Binghamton on sabbatical and on a fellowship. In early 2020, as a result of the COVID pandemic began, Binghamton faculty began teaching remotely.

31. While still on her fellowship, Dr. Barzman, who had no experience teaching online, began contacting the other members of the department on the department's faculty listserv for assistance in getting up to speed with online instruction, anticipating her return to teaching in August 2020. No one ever responded to Dr. Barzman's requests for help or advice. When Dr. Barzman returned to Binghamton for the Fall 2020 semester, teaching was still remote, and she continued to reach out to her colleagues for tips and assistance. There was still no response whatsoever. It was unprecedented in Dr. Barzman's 22 plus years at Binghamton for an Art History faculty member's listserv queries to be ignored.

32. Dr. Barzman then requested that the Art History chair at the time, Pamela Smart, place an item on a faculty meeting agenda for sharing tips on on-line teaching. Even though the topic would presumably been useful to the Art History faculty, Smart repeatedly rejected Dr. Barzman's request for the agenda item. In Dr. Barzman's experience, it was also unprecedented to reject a senior faculty member's request for an agenda item for a faculty meeting.

33. During the Fall 2020 semester, a Binghamton Art History major who was in serious personal distress and in danger of failing all her classes had confided in Dr. Barzman and in other department faculty members that she was living alone in a cabin in the woods, estranged from her family, and being sexually harassed by a physician who was prescribing her psychiatric medications. Dr. Barzman brought the matter up at a faculty meeting to discuss the department's obligation to protect its students who report being victims of sexual harassment and to notify authorities about what this student had alleged. Tagg vigorously rejected the idea and sharply criticized Dr. Barzman for the impropriety of bringing up the topic at a faculty meeting, stating that the student's allegations "were a personal matter and none of our business," despite their impact on her ability to meet basic requirements in our classes and despite her having confided in several department faculty members. Others present at the meeting did not contradict Tagg on these points.

34. Disadvantageous teaching assignments were also part of the pattern of singular behavior toward Dr. Barzman. These assignments impeded her ability to build her enrollments, foster a cohort of students to follow her from semester to semester, and built relationships that could lead to supervision for honors, MA, and Ph.D theses – all benchmarks that bring recognition to faculty in the form of merit raises and monetary teaching awards.

35. In the Fall of 2021, Dr. Barzman was again assigned a Friday morning time slot for her 3-hour weekly seminar. That slot is unfavorable because students are extremely unlikely to enroll in a Friday morning three hour seminar. Dr. Barzman had been assigned that same disadvantageous slot more than any other faculty in the Art History Department, including junior faculty. When Dr. Barzman protested to Smart, then chair and responsible for designing the

teaching schedule, Smart agreed to change the schedule but did not do so and, in the end, Dr. Barzman was forced again to accept a disadvantageous assignment.

36. Dr. Barzman was also habitually prevented from contributing substantively to department personnel committees for tenure and promotion. As a senior member of the Art History Department, it was Dr. Barzman's privilege as well as her right and responsibility to sit on such committees and take her turn as committee chair. But Tagg and his department allies consistently excluded Dr. Barzman from playing any leadership role and belittled, marginalized, or completely rejected her committee contributions.

37. This professional marginalization on department personnel committees was often accompanied by menacing aggression on the part of Tagg, to which other department members turned a blind eye.

38. One such situation was in January 2014, concerning the mandated 3rd-year review of Assistant Professor Kevin Hatch. Tagg seized control of Dr. Barzman's committee assignment (to draft the committee's review of Hatch's record) and tried to intimidate her into silence. When Dr. Barzman tried to stand up for herself, Tagg became extremely angry and menacing. Dr. Barzman approached multiple Binghamton administrators and offices about Tagg's menacing behavior including department chair Tom McDonough, Harpur College Dean Ann McCall, Ombudsman Dawn Osborne-Adams Affirmative Action Officer Valerie Hampton (also Title IX Officer), Director of Human Resources Joseph Schultz, HR Assistant Director Sara DeClemente Hammoud, Chairs of the Ethical Standards Committee Gale Spencer and Sharon Bryant. Dr. Barzman had already spoken about Tagg's behavior to many of these administrators. In 2014 she informed all of them of the following by email:

> "I have been directed to your offices to continue my efforts to receive protection in the workplace from intimidation, harassment, and efforts at either silencing or coercion on the part of a colleague [Tagg], from whom I suffered verbal, emotional and physical abuse in a nine-year domestic relationship. (…) Over the course of the 14-some years I've been working at Binghamton University, this colleague has been either chair or Director of Graduate Studies in my department (…). Even when he has not been in a supervisory relationship with me, he has continued to act aggressively, to denigrate and humiliate me publicly, and to consistently silence me in terms of my professional voice in the department. I have attempted to bring my concerns to previous [administrators] (…) The problems are now quite acute. (…) I am afraid to go to department meetings and I am literally ill with anxiety about confrontations in the workplace (…)."

Dr. Barzman specifically told Ms. Osborne-Adams, "I have extreme levels of anxiety about going to work on campus and fear for my personal safety regarding John Tagg."

39. There was no meaningful response to Dr. Barzman's complaints. Specifically, nothing was done to prevent Tagg from continuing his abuse of Dr. Barzman or to remove Dr. Barzman from the abusive situation by moving her to a a different department. Indeed, Dr. Barzman was punished for speaking out in her own defense both by department members and by then Harpur College Dean Ann McCall, who warned Dr. Barzman in a meeting in the dean's office that Dr. Barzman's Art History colleagues found it "uncomfortable" and "unfair" when she spoke of Tagg's history of domestic abuse and connected it with Tagg's current abuse of her in the workplace.

40. The abuse Dr. Barzman experienced on department personnel committees continued, with Tagg typically chairing the committees. In the Spring semester of 2019, Um (then department chair) called for the personnel committee to convene in anticipation of Art History assistant professor Julia Walker coming up for tenure and promotion in the following academic year (2019-2020). Once again Tagg was appointed committee chair, despite the direction of Harpur College Dean Ann McCall in 2014 that, given Dr. Barzman's allegations of

domestic abuse against Tagg, Dr. Barzman should not be required to sit on committees with Tagg, especially under his authority. Under Tagg's direction, Dr. Barzman was given a marginal committee assignment, meetings were scheduled with disregard to her other commitments, and her suggestions and concerns for an external evaluator for Walker's promotion file were summarily rejected as were her concerns regarding procedural violations and nepotism towards Walker on the part of Tagg and his allies.

41. In December 2020, at an Art History Department faculty meeting, Dr. Barzman took the initiative and proposed convening the Department's personnel committee in advance of several other faculty members coming up for tenure and promotion the following academic year (2020-2021). Pamela Smart (then department chair) and the other faculty members present at the meeting ignored Dr. Barzman's suggestion. Yet the following month Andrew Walkling, one of Tagg's faculty allies, made the exact same suggestion in an email to tenured department members. Nancy Um, by then Associate Dean of Harpur College at Binghamton University but still nominally in the Art History Department, responded immediately via return email: "Sounds like a great plan Andrew."

42. As set forth in detail above and below, Dr. Barzman continually told senior leaders at Binghamton about Tagg's domestic violence toward her and how it had led to continued workplace harassment and abuse. Dr. Barzman repeatedly requested that Binghamton protect her from Tagg by moving her to a different department. Even though professors had been moved between departments at Binghamton before, and even though Dr. Barzman's scholarship would have allowed her to work in other Harpur departments including but not limited to Anthropology, Sociology, History, and Comparative Literature, Binghamton's administrators

refused to help her and left her vulnerable to continued abuse and harassment from Tagg and his allies in the Art History Department.

43. As a result of the harassment and abuse, Dr. Barzman has suffered severe psychological distress and medical problems including cardiac issues that required frequent emergency medical care and a surgical intervention in 2015.

44. Beginning in 1999 and continuing to the present, Dr. Barzman spoke about Tagg's abuse to a variety of persons at Binghamton including:

a. Defendant Donald Neiman – Neiman is currently Binghamton's Provost and Vice President of Academic Affairs, and was formerly Dean of Harpur College, the administrative unit of Binghamton that includes the Art History Department. Dr. Barzman first told Neiman that she was a victim of domestic and workplace abuse by Tagg as early as October 2009. Neiman took no action to protect Dr. Barzman from the abuse from Tagg and others and was one of the persons who refused to move Dr. Barzman into a new department when she renewed her request to be separated from her domestic abuser in 2021.

b. Jean Pierre Mileur – Mileur was Neiman's predecessor as Harpur Dean. Dr. Barzman told Mileur about Tagg's abuse in 2005 when she asked him to appoint her to the position of Director of BU's Center for Medieval & Renaissance Studies (CEMERS) so that she could escape the abuse she was suffering in the Art History Department. Mileur granted Dr. Barzman's request and she served in as Director of CEMERS from 2006-2011. Mileur did not take any other action, however, in response to Dr. Barzman's complaints of abuse.

    c. Dawn Osborne Adams – Osborne Adams was Binghamton's Ombudsman from 2011 to 2015. Dr. Barzman told Osborne Adams of Tagg's domestic abuse and workplace abuse she was experiencing as early as 2012. In the Spring of 2014, Dr. Barzman told Osborne Adams she "feared for her life" because of Tagg's menacing behavior. Other than attempting to mediate between Dr. Barzman and members of the Art History Department, Osborne Adams took no action in response to Dr. Barzman's complaints of abuse and requests for protection.

    d. Bathabile Mthombeni – Ms. Mthombeni was Binghamton's ombudsman from 2015 to the present. In 2015 and 2016, Dr. Barzman told Ms. Mthombeni about Tagg's domestic abuse and workplace abuse and about Nancy Um's role in the malicious treatment Dr. Barzman was experiencing in Art History. At the time, Um was Art History chair. Ms. Mthombeni took no effective action in response to Dr. Barzman's complaints of abuse and request for protection.

    e. Ann McCall – Dr. McCall was Harpur Dean in 2014. Dr. Barzman told Dr. McCall about Tagg's domestic abuse and continued workplace harassment in January 2014. Although Dr. McCall instructed that Tagg should not sit in any supervisory position with respect to Dr. Barzman, Dr. McCall did not formalize this decision and did not put into place any process to make sure it was followed.

    f. Valerie Hampton and Sarah DeClemente-Hammoud – Dr. Barzman, along with a union representative, met with Hampton and DeClemente-Hammoud in 2014 and provided a thorough account of Tagg's domestic and workplace abuse. They took no action to protect her from continued abuse from Tagg in the workplace and denied Dr. Barzman's request to move her into a different department. Even

though Ms. Hampton's responsibilities at the time included being Binghamton's Title IX Coordinator. Ms. Hampton did not explain to Dr. Barzman her rights under Title IX.

g. James Pittaresi – Dr. Pittaresi is/was Binghamton's Assistant Provost and Executive Director of the Center for Learning and Teaching. Dr. Barzman told Dr. Pittaresi about Tagg's domestic and workplace abuse in 2016. Although Dr. Pittaresi offered emotional support to Dr. Barzman, he did nothing to protect her from the abuse of Tagg and other in the Art History Department.

h. Defendant Celia Klin – Klin is the current Dean of Harpur College. Dr. Barzman first approached Klin in January 2021 (when Klin was interim dean). Over the next two to three months Dr. Barzman had an extended email exchange with Defendant Klin concerning the history of Tagg's domestic abuse and the continuing abuse in the workplace. In these communications, Dr. Barzman, invoking Title IX, requested multiple times that she be moved to a different department. Dean Klin initially expressed sympathy and concern and agreed to move Dr. Barzman out of Art History. But Klin refused to follow through after consulting with Defendant Neiman, Binghamton's head of HR Joe Schulz, and Art History department chair Pamela Smart. Klin repeatedly stated that she could not move Dr. Barzman into a different department. Instead, in March 2021 Defendant Klin presented Dr. Barzman with a Memorandum of Understanding ("MOU") under which Dr. Barzman would remain in Art History and effectively agree to her marginalization in that department, including abdicating all her rights

and responsibilities on department committees and even the ability to communicate with department colleagues. Dr. Barzman refused to sign the MOU.

    i.    Defendant Andrew Baker – Baker is the current Title IX Officer at Binghamton. Dr. Barzman spoke to him from March to May 2021 and informed him about the history of Tagg's domestic abuse and how it was continuing to affect her workplace environment. Baker offered no assistance other than speaking to Klin about the case but would not address Klin's failure to move Dr. Barzman to a new department.

45.    In July of 2021, Dr. Barzman enlisted the assistance of her union, UUP. She told Chris Sielaff, the union's labor relations specialist at Binghamton about the history of the abusive relationship with Tagg and how it was continuing to affect her at work. Mr. Sielaff advocated on Dr. Barzman's behalf with Binghamton's HR Department and again requested they she be moved to another department, but that request was, once again, denied.

46.    In August 2021, Dr. Barzman, with no other options, and desperate to escape the toxic work environment in the Art History Department, accepted an arrangement which allowed her to be paid her an additional year's salary, with no departmental responsibilities other than completion of her two remaining doctoral students, in exchange for her retirement effective August 2022.

**FIRST CLAIM FOR RELIEF**
(Violation of Title IX Against Defendant Binghamton)

47.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

48. At all times relevant to this action, Binghamton has been a recipient of federal financial assistance.

49. Binghamton violated Title IX through its deliberate indifference to the sex-based harassment and abuse Plaintiff suffered from Tagg and other persons at Binghamton.

50. As a result of Binghamton's deliberate indifference, Plaintiff was constructively discharged from her employment at Binghamton and suffered damage to her career, severe emotional distress and physical damages.

**SECOND CLAIM FOR RELIEF**
(Retaliation in Violation of Title IX Against Defendant Binghamton)

51. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

52. At all times relevant to this action, Binghamton has been a recipient of federal financial assistance.

53. Plaintiff opposed sex-based discrimination at Binghamton by making a series of complaints concerning Tagg's domestic violence against her and the related workplace harassment she suffered.

54. Binghamton retaliated against Plaintiff for her exercise of protected rights under Title IX by subjecting to her to additional harassment and disparate treatment, all in violation of Title IX.

55. As a result of Binghamton's retaliatory conduct, Plaintiff was constructively discharged from her employment at Binghamton and suffered severe emotional distress and physical damages.

### THIRD CLAIM FOR RELIEF
(Discrimination in Violation of NYSHRL Against All Defendants)

56. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

57. Defendants violated the NYSHRL by discriminating against her based on her sex and status as a victim of domestic violence.

58. As a result of Defendants' unlawful discrimination, Plaintiff was deprived of compensation, was constructively discharged from her employment, and suffered severe emotional distress and physical damages.

### FOURTH CLAIM FOR RELIEF
(Retaliation in Violation of NYSHRL Against All Defendants)

59. Plaintiff repeats and realleges the allegations contained in the preceding paragraphs above as if fully set forth herein.

60. Defendants violated the NYSHRL by retaliating against her based on complaints of discrimination based on her sex and status as a victim of domestic violence.

61. As a result of Defendants' unlawful retaliation, Plaintiff was constructively discharged from her employment and suffered severe emotional distress and physical damages.

### JURY DEMAND

Plaintiff demands trial by jury of all issues as of right by a jury.

**WHEREFORE**, Plaintiff demands judgment against Defendants:

A. Awarding Plaintiff lost wages and compensatory damages including damages for emotional distress;

B. Awarding Plaintiff punitive damages;

C. Awarding reasonable attorneys' fees, costs, and expenses; and

Granting such other legal and equitable relief to the Plaintiff as the Court may deem just and equitable.

Dated:      New York, New York
            April 18, 2022

                            GISKAN SOLOTAROFF & ANDERSON LLP


                                    _____/s/_____
                        By:    Jason L. Solotaroff
                               jsolotaroff@gslawny.com
                               (646)964-9640
                               90 Broad Street
                               New York, New York 10004
                               *Attorney for Plaintiff*