**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KAREN BARZMAN, PH.D.,

                         Plaintiff,

    v.                                             3:22-cv-367
                                                   (ECC/ML)

STATE UNIVERSITY OF NEW YORK,
DONALD NEIMAN, CELIA KLIN, ANDREW
BAKER, and NANCY UM,

                         Defendants.

---

Amy Robinson, Esq., *for Plaintiff*
Brian W. Matula, Esq., *for Defendants*

**Elizabeth C. Coombe, United States District Judge:**

## MEMORANDUM-DECISION & ORDER

On November 17, 2022, Plaintiff Karen Barzman, Ph.D., filed an Amended Complaint alleging violations of Title IX of the Education Amendments of 1972 (Title IX), Title VII of the Civil Rights Act of 1964 (Title VII), and the New York State Human Rights Law (NYSHRL) against Defendants State University of New York at Binghamton (the University), Donald Neiman, Celia Klin, Andrew Baker, and Nancy Um. Dkt. No. 40. Specifically, Plaintiff asserts that while she was a professor at the University, the University was deliberately indifferent to sex-based discrimination and abuse that she suffered from another professor leading to her constructive discharge, in violation of Title IX, and that the University retaliated against her for complaining about the professor's domestic violence against her and related workplace harassment, in violation of Title IX. Compl. ¶¶ 54-55, 58-60. She also asserts a Title VII sex discrimination claim based on a hostile work environment and deliberate indifference to the sex-based discrimination and abuse resulting in her constructive discharge and a Title VII retaliation claim because the

University retaliated against her for her complaints about the professor's domestic violence against her and related workplace harassment by "subjecting . . . her to additional harassment and disparate treatment. Compl. ¶¶ 69-70, 72-74. Finally, she asserts a NYSHRL discrimination claim based on her sex and status as a domestic violence victim and a retaliation claim. Compl. ¶¶ 62-63, 65-66. Presently before the Court is Defendants' motion for summary judgment. Dkt. No. 66. The motion is fully briefed. Dkt. Nos. 74, 75, 80. For the following reasons, Defendants' motion for summary judgment is granted in part.

## I.      Background[1]

Plaintiff had a romantic relationship with John Tagg, a University Art History Department (Department) professor, from 1996 to 2005. Pl. SUMF ¶¶ 2-4; Pl. Resp. SUMF ¶ 1. Plaintiff asserts that Tagg was "physically violent and emotionally abusive" during their relationship. Pl. Resp. SUMF ¶ 5. In 1999, during their relationship, Plaintiff joined the Department as a faculty member, and she became a full professor in 2017. Pl. SUMF ¶¶ 2, 3. After Plaintiff began working at the University, Tagg treated her "in a demeaning and patronizing manner at faculty meetings and on the department email listserv." Pl. SUMF ¶ 12.

---

[1] The facts are drawn from the Defendants' Statement of Material Facts (Def. SUMF), Dkt. No. 66-1, Plaintiff's Statement of Additional Material Facts (Pl. SUMF), Dkt. No. 75 at 25-55, Plaintiff's Response to Defendant's Statement of Material Facts (Pl. Resp. SUMF), Dkt. No. 75 at 1-24, to the extent those facts are well-supported by pinpoint citations to the record, as well as attached and cited exhibits. Disputed facts are noted. Plaintiff argues that the motion should be denied because Defendants' Statement of Material Facts does not comply with Local Rule 56.1. Specifically, Plaintiff asserts that it (1) includes facts that are not material, (2) includes citations that are not sufficiently specific, and (3) cites exhibits to declarations that were not provided in discovery. Pl. MOL at 5-7. To the extent that these arguments affect whether Defendants' motion for summary judgment should be granted, the Court will consider them in the context of specific factual assertions.

In 2005 or 2006, Tagg "accost[ed]" Plaintiff after 5:00 p.m., raised his voice, became red in the face, and demanded that she return the engagement ring that he had given her, Barzman Deposition (Barzman Dep.) at 100-02, Dkt. No. 75-6,[2] and, after she ended the romantic relationship, Tagg yelled at her "each time she passed by his office," Pl. SUMF ¶ 17.

Tagg was the Department Chair from January 1, 2007 through August 31, 2007 and from January 1, 2009 through August 31, 2010.  Pl. Resp. SUMF ¶ 16.  As Department Chair, Tagg denied Plaintiff funding for departmental functions.  Pl. SUMF ¶ 41.  According to Plaintiff, even when Tagg was not the Chair, he exerted control over the Department.  Pl. Resp. SUMF ¶ 16; Pl. SUMF ¶ 16.

In January 2014, as part of a committee assignment, Plaintiff drafted a review of an assistant professor, and "Tagg inserted himself into the process, tried to intimidate" her, and, became extremely angry and menacing" when she "tried to stand up for herself."  *Id.* at ¶ 32.

In 2014, after a faculty meeting, Tagg stood between Plaintiff and her office door and "verbally abused" her, but she does not recall what Tagg said, and Tagg did not put his hands on her.  Barzman Dep. at 65-68.  In 2014, Tagg also yelled at her during a faculty meeting, Pl. SUMF ¶ 31, and gave work to a graduate student Plaintiff was advising, *id.* at ¶ 33.

On September 1, 2014, Tagg became the Interim Department Chair, and he held this position until December 31, 2014.  Pl. Resp. SUMF ¶ 17.  In 2014, Plaintiff talked to the University's human resources division and expressed concern about Tagg supervising her.  Def. SUMF ¶¶ 18-19.  In the fall of 2014, while Tagg was Interim Department Chair, Plaintiff reported to an Associate Dean, not Tagg, but Plaintiff claims that this did not affect the power Tagg over her and that "there was no clarity about the reporting structure, really."  Pl. Resp. SUMF ¶¶ 24-25;

---

[2] Citations to page numbers refer to ECF pagination unless otherwise noted.

*see also* Pl. SUMF ¶ 175.[3]  Tagg did not serve as Department Chair or Director of Graduate Studies for the Department after 2014.  Pl. Resp. SUMF ¶¶ 27, 28.

Meanwhile, according to Plaintiff, between 2003 and 2014, she contacted multiple University administrators asking, among other things, to be transferred and reporting past domestic abuse by Tagg.  *See* Pl. SUMF ¶¶ 91-113 (listing the administrators she contacted and the subject matter of those contacts).

Um was the Interim Department Chair during 2015, and she was the Department Chair form January 1, 2018 through August 14, 2019.  Dkt. No. 66-4 ¶¶ 5, 7.  As Department Chair, Um denied Plaintiff funding for departmental functions.  Pl. SUMF ¶ 41.

In 2015, Plaintiff contacted the Ombudsman "requesting support specifically relating to conflict and tension with [Defendant] Um."  Pl. SUMF ¶ 114.  In an email to him, she wrote that she brought up her former abuse a few years ago, and "then people made clear that they found it profoundly distasteful" and "[t]hey didn't want to hear about it," "[b]ut given that it has shaped my positioning in the dept and continues to do so, it is still relevant.  And needs to be understood or at least acknowledged at some level if we as a group are to move forward with me as an integral and respected part."  Dkt. No. 75-9 at 3.

In 2016, Plaintiff contacted the Vice Provost explaining, "I had a troubling experience around academic integrity on campus this summer and remain dismayed at the manner in which my own department chair and the graduate school handled the matter."  Dkt. No. 75-42 at 2; Pl. SUMF ¶ 115.

---

[3] According to Plaintiff, "nobody followed up with [Plaintiff] regarding a new reporting structure" after the Associate Dean left the University, Pl. SUMF ¶ 176, but it is undisputed that Tagg's term as Interim Chair ended on December 31, 2014,  Pl. Resp. SUMF ¶¶ 16-17.

In 2019, Plaintiff told Department Chair Um that "she had been abused by Tagg." Pl. SUMF ¶ 124. In addition, according to Plaintiff, during the spring 2019 semester, Department Chair Um "convened a personnel committee to address a colleagues' candidacy for tenure and promotion, and appointed Tagg as committee chair, who then gave [plaintiff] a marginal committee assignment, scheduled meetings" without considering her other commitments and "her suggestions and concerns were summarily rejected." Pl. SUMF ¶ 40. The parties disagree about whether a committee chair has supervisory authority over committee members. *Compare* Def. SUMF ¶ 32 *with* Pl. Resp. SUMF ¶ 32. In addition, the parties disagree about why Tagg chaired personnel committees. According to Defendants, it was the practice for the most senior Department member, who was Tagg, to chair personnel committees. Dkt. No. 80 at 8-9 (citing Dkt. No. 66-4 ¶ 35). According to Plaintiff, "Tagg, with Um's support, chaired a disproportionate amount of those meetings, at Tagg's insistence." Pl. SUMF ¶ 54. Plaintiff does not, however, provide any evidence that Tagg chaired a personnel committee from 2015 through 2018. Pl. Resp. SUMF ¶¶ 16.

In addition, "Tagg and his department allies . . . consistently excluded [Plaintiff] from playing any leadership role on department personnel committees and belittled, marginalized, or completely rejected her committee contributions, and when Tagg chaired a committee meeting, Plaintiff "could not meaningfully participate . . . due both to re-traumatization, and Tagg ignoring her, laughing at her, cutting her off, or raising his voice and growing angry with her," and Tagg did not treat anyone else this way. Pl. SUMF ¶¶ 24, 55.

In 2019, Defendant Nancy Um and Professor Amy Gay created Digital Humanities Research Institute (DHRI), a workshop open to no more than 18 faculty members and graduate students. Def. SUMF ¶¶ 35, 37. Digital humanities was relevant to Plaintiff's research, and she

applied, but on March 22, 2019, her application, one of 40 to 50, was rejected.  Pl. SUMF ¶¶ 35, 37, 38; Pl. Resp. SUMF ¶ 37.  Um, a co-chair of the committee deciding who would be accepted, advocated for Plaintiff.  Def. SUMF ¶ 36, 39; Pl. Resp. SUMF ¶ 38; Pl. SUMF ¶ 36.  Plaintiff later learned that one spot in the workshop was never filled.  Pl. SUMF ¶ 38.

Later that year, a group was created to discuss and study "spatial humanities."  Def. SUMF ¶¶ 42-44.  The parties dispute whether Um notified Plaintiff about this group when she learned about it, and whether Um and Gay or an Associate Professor controlled this group.  Pl. Resp. SUMF ¶¶ 45-46.  Plaintiff was invited to the meetings after she contacted the Associate Professor. Pl. Resp. SUMF ¶ 46.  Plaintiff also regularly participated in digital humanities workshops organized by Um which were open to the entire faculty, and the parties agree that Plaintiff did not attend all of the meetings.  *Id*. at ¶¶ 47-48.

Plaintiff was on sabbatical from August 2019 through May 2020.  Def. SUMF ¶ 34.  In April and May 2020, Plaintiff spoke with the department chair several times "regarding the technical implications of online teaching" and the lack of responses from faculty Plaintiff had contacted. *Id*. at ¶¶ 50-51; Pl. SUMF ¶ 44.   The department chair told her to contact the digital humanities liaison, Gay, at the library. Dkt. No. 66-7 at 50;  Pl. SUMF ¶ 127.  Plaintiff submitted a Google form to the library asking for help "getting up to speed with remote teaching" in May 2020.  Def. SUMF ¶ 53.  The library did not respond for almost three months, but before the fall 2020 semester began, Gay responded, apologized for the delay, and "had Zoom meetings or calls" with Plaintiff.  Def. SUMF ¶¶ 54-55; Dkt. No. 66-7 at 51-52.  Plaintiff testified that they "were 'very focused on [Plaintiff's] teaching,'" but she takes the position that she did not receive the assistance she requested and received only assistance with hardware issues.  Dkt. No. 66-7 at 52, 57; Pl. Resp. SUMF ¶ 55.

6

On January 27, 2021, Plaintiff emailed Defendant Celia Klin, Dean of Harpur College, a college within the University, stating that Tagg had abused her.  Pl. SUMF ¶ 2; Def. SUMF ¶¶ 56-57.  Klin gave Plaintiff contact information for  Defendant Baker, the Title IX coordinator for the University.  Def. SUMF ¶ 58.  Plaintiff also asked to be transferred to a different department, and Klin did not transfer Plaintiff.  Def. SUMF ¶¶ 56-61, 63-64, 67; Pl. SUMF ¶¶ 138.  The parties disagree about how much authority a dean had to "assist" or "facilitate" such transfers.  Def. SUMF ¶¶ 67-68; Pl. Resp. SUMF ¶¶ 67-68; Pl. SUMF ¶ 146-54.  Klin met with the provost, Defendant Nieman, to discuss Plaintiff's departmental transfer request, and after this meeting Klin declined Plaintiff's subsequent transfer requests.  Pl. SUMF ¶¶ 189, 193.

Plaintiff "requested that . . . Klin not speak with anyone in her Department concerning their discussions."  Def. SUMF ¶ 64.  Plaintiff and Klin discussed whether arrangements could be made in the Department to "reduce or eliminate contact with other members of the Department that she found objectionable."  Def. SUMF ¶ 72.  On March 16, 2024, Klin gave Plaintiff a proposed Memorandum of Understanding (MOU) to document Klin's proposal that Plaintiff remain in the Department, but sever virtually all communications with the Department.  *Id*. at ¶ 74; Pl. SUMF ¶¶ 185, 187.  Plaintiff requested a meeting with Klin to "fine tune" the MOU, but Plaintiff postponed the scheduled meeting and never requested that the meeting be rescheduled.  Def. SUMF ¶¶ 75-76.

On March 24, 2021, Plaintiff received a "Title IX Memorandum."  Def. SUMF ¶ 77.  Later that day, Plaintiff contacted Baker to discuss the Title IX process.  *Id*. at ¶ 79.  The next day, Baker told Plaintiff that "he was aware that Plaintiff was working informally with . . . Klin, but that if Plaintiff wanted to file a formal complaint, that she could contact either . . . Baker or the University's Office of Diversity, Equity & Inclusion."  *Id*. at ¶ 80.  Plaintiff emailed Baker on

March 26, 2021, requesting "clarity" on "what a formal complaint would require of [Plaintiff]" and expressing frustration with Klin's proposal. Pl. SUMF ¶ 141. During an April 2, 2021 meeting with Baker, Plaintiff asked to be removed from the Department. *Id*. at ¶ 142. On April 8, 2021, Plaintiff emailed Baker repeating her "dissatisfaction" with Klin's proposed approach. *Id*. at ¶ 143.

In the summer of 2021, Plaintiff's union representatives met with the University's human resources division and discussed Plaintif's departure from the University. Pl. Resp. SUMF at ¶¶ 86-90. On July 23, 2021, Plaintiff submitted a phased retirement agreement form proposing that she leave the University on September 1, 2022. *Id*. at ¶ 91. The parties dispute whether this was a retirement plan. *Compare* Def. SUMF ¶ 91 *with* Pl. Resp. SUMF ¶ 91. Plaintiff's "Phased Retirement Program Application" was approved on August 3, 2021. *Id*. at ¶ 92. Plaintiff was paid her full salary and "had no obligations in connection with the [Department], other than finishing the supervision of two graduate students" between August 23, 2021 and August 31, 2022. *Id*. at ¶ 93. Between November 2021 and "early 2022," Plaintiff's name was not included as a Department faculty member on the bulletin board outside the Department's main office, and when her name was added in early 2022, she was not identified as "faculty." Pl. SUMF ¶¶ 50-51.

Plaintiff filed a charge of discrimination with the EEOC on January 3, 2022. Def. SUMF ¶ 95-96. That charge related only to wage disparity on the basis of sex; it did not mention hostile work environment, discrimination because she was a domestic violence victim, or retaliation. *Id*.

Plaintiff commenced this action on April 18, 2022. *Id*. at ¶ 97; Dkt. No. 1. On September 7, 2022, Plaintiff received a right to sue notice from the EEOC. Def. SUMF ¶ 98. After receiving that right to sue notice, Plaintiff filed a second charge of discrimination with the EEOC on September 14, 2022. *Id*. at ¶ 99. On September 20, 2023, Plaintiff received a right to sue notice

8

from the EEOC regarding her second EEOC charge. *Id*. at ¶ 100. Plaintiff filed the Amended Complaint on November 17, 2023. *Id*. at ¶ 101; Dkt. No. 40.

## II.    Legal Standard

Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may meet this burden by showing that the nonmoving party has "'fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party has "'failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim") (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. NW Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citing *Anderson*, 477 U.S. at 255). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir. 2001). However, "in discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003) (quotations omitted).

III.    **Discussion**

    A. **Federal Claims**

        1. **Timeliness**

Defendants argue that Plaintiff's federal claims are barred under the statute of limitations and that the continuing violation doctrine does not apply. Defendants' Memorandum of Law (Def. MOL) at 6-9, 18-20, Dkt. No. 66-2. Plaintiff responds that her claims are timely because actionable conduct occurred during the limitations periods, and, for her Title IX claims, the continuing violation doctrine applies because the University "consistently displayed deliberate indifference to her complaints of harassment and discrimination." Plaintiff's Memorandum of Law (Pl. MOL) at 25-27, Dkt. No. 74. She also argues that the discriminatory acts that occurred within the limitations period are "the exact same type of conduct she had been experiencing for years." *Id.* at 27. Defendants reply that Plaintiff did not offer evidence of any actions that occurred within the limitations period. Defendants' Reply (Reply) at 5-8.

### a. Title IX Hostile Work Environment Claim

As an initial matter, both parties treat Plaintiff's Title IX sex discrimination claim as a hostile work environment claim. Pl. Mem. at 12-14, 25-27; Def. MOL at 4, 12, 17. In addition, Plaintiff appears to rely on her alleged status as a domestic violence victim to show discrimination based on sex, but she does not identify any binding authority to support her theory. For purposes of this motion the Court assumes, without deciding, that Plaintiff's status as a domestic violence victim could support a hostile work environment claim on the basis of sex.

"[A] Title IX hostile education environment claim is 'governed by traditional Title VII 'hostile environment' jurisprudence.'" *Papelino v. Albany College of Pharmacy,* 633 F.3d 81, 89 (2d Cir. 2011) (quoting *Hayut v. State Univ. of New York,* 352 F.3d 733, 744 (2d Cir. 2003)). "A Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the

11

conditions of his educational environment." *Id.* (quoting *Hayut,* 352 F.3d at 745).  *See Littlejohn v. City of New York*, 795 F.3d 297, 320–21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) ("To establish a hostile work environment under Title VII . . . a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'").  "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id*. (quoting *Raspardo v. Carlone,* 770 F.3d 97, 114 (2d Cir. 2014)).  In evaluating hostile work environment cases, courts are instructed to "consider the totality of the circumstances," in particular "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id*. (quoting *Harris,* 510 U.S. at 23).

"For an educational facility to be liable, however, the plaintiff must establish that a school official with 'authority to address the alleged discrimination and to institute corrective measures' had 'actual knowledge' of the discrimination and failed to adequately respond." *Papelino,* 633 F.3d at 89  (quoting *Gebser v. Lago Vista Indep. School Dist.¸* 524 U.S. 274, 280 (1998)).  In addition, "[a] school fails to adequately respond if it provides no response or if it provides a response that 'amount[s] to deliberate indifference to discrimination.'" *Id.*  Furthermore, "[t]he school's response to sex discrimination must be 'clearly unreasonable' in light of known circumstances." *Id.* (quoting *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 648 (1999)).

"Under the continuing violation doctrine, a plaintiff may bring claims for discriminatory acts that would have been barred by the statute of limitations as long as an act contributing to that

12

discrimination took place within the statutory time period." *Purcell v. N.Y. Inst. of Tech. Coll. of Osteopathic Med.*, 931 F.3d 59, 65 (2d Cir. 2019) (cleaned up) (quoting *Papelino*, 633 F.3d at 91). "Therefore, 'a continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the defendant to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Id.* (quoting *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994)).

"[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period.'" *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir. 2010) (quoting *Nat'l Railroad Pass. Corp. v. Morgan,* 536 U.S. 101, 105 (2002)). As a result, "if 'any act falls within the statutory time period,'" the court "need[s] 'to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice.'" *Id.* at 76 (quoting *Morgan,* 536 U.S. at 120). This requires "an individualized assessment of whether incidents and episodes are related." *McGullam,* 609 F.3d at 77.

"Mindful of the 'fact-specific' and 'amorphous' nature of hostile work environment claims, the Second Circuit Court of Appeals has instructed courts to make an 'individualized assessment of whether incidents and episodes are related.'" *Dikambi v. City Univ. of New York*, No. 2021 WL 4198252, at *3 (S.D.N.Y. Sept. 14, 2021) (quoting *McGullam*, 609 F.3d at 77). Courts have considered:

> whether the incidents occurred in different environments, such as different departments, *see McGullam*, 609 F.3d at 78; whether there was an "intervening action by the employer," *see id.*; *Morgan*, 536 U.S. at 118; whether the harasser was the same, *see Dikambi*, 2021 WL 4198252, at *4; *Sanderson v. N.Y.S. Elec. & Gas Corp.*, 560 F. App'x 88, 92 (2d Cir. 2014) (summary order); and the frequency of the conduct, *see Morgan*, 536 U.S. at 120–21 (affirming relatedness of conduct

13

where pre- and post-limitations period conduct "involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers" (alteration adopted) (internal quotation marks and citation omitted)).

*Ball v. Marriott Int'l, Inc.*, 627 F. Supp. 3d 296, 314–15 (S.D.N.Y. 2022). In addition, "'[t]he lapse in time between the two events is not itself dispositive,' though it may be relevant." *Id.* (quoting *Dikambi*, 2021 WL 4198252, at *4 and citing *McGullam*, 609 F.3d at 78 ("Although [an] incident-free interval does not preclude relatedness, it renders less plausible the notion that" comments that may appear otherwise unrelated are "of a piece" with other offensive conduct); *Villar v. City of New York*, 135 F. Supp. 3d 105, 132 (S.D.N.Y. 2015) ("[A] twenty-one-month gap, in normal circumstances, would make it less plausible that the conduct is sufficiently related to constitute a continuing violation. . . .")). Furthermore, "the more similar the incidents are in severity, the more likely it is that the incidents are related under *Morgan*." *Id.* (quoting *McGullam*, 609 F.3d at 78 n.5). Finally, although "a harassing incident need not be overtly sex-based, there must be reason to believe that the act was motivated by the plaintiff's sex in order for the incident to contribute to a sexually hostile work environment." *Id.* (citing *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002)).

There is a three-year statute of limitations for Title IX claims. *See Irrera v. Humpherys*, 695 F. App'x 626, 628 (2d Cir. 2017) (applying three-year statute of limitations to Title IX sexual harassment claim) (citing *Curto*, 392 F.3d at 503). Plaintiff commenced this action on April 18, 2022, and the statute of limitations date for Plaintiff's Title IX claims is therefore April 18, 2019.

On the threshold question of whether Plaintiff alleged any discriminatory conduct within the limitations period, Plaintiff argues that since April 18, 2019, (1) the DHRI rejected her, (2) her Department colleagues did not "communicate with her or answer her questions regarding remote teaching during the COVID-19 pandemic," (3) she "was forced to sit on a personnel committee

14

led by her abuser in violation of past assurances from a Binghamton administrator" and (4) she "was forced to endure 'a toxic workplace culture in which [she] continues to be re-victimized to this day [March 24, 2021].'" Pl. MOL at 26.

Regarding the DHRI rejection, as Plaintiff admits, that rejection occurred on March 22, 2019, and it is therefore outside the limitations period. Pl. SUMF ¶ 38. As for Plaintiff's argument that the DHRI later rejected her again, even viewing the evidence in the light most favorable to Plaintiff, the cited portion of her testimony establishes only that a 2021 workshop was planned and that she planned to apply, but not that she was rejected. Barzman Dep. at 143, 146. Plaintiff also cites to her testimony that participants from the first workshop had virtual "intensive workshops" that she was not aware of. *Id.* at 145. This testimony—which does not state that she was rejected or when that rejection occurred—is not sufficient to support her argument that she was rejected a second time. In any event, Plaintiff participated in the "spatial humanities working group" that also began in 2019, and she regularly participated in digital humanities workshops organized by Um which were open to the entire faculty, but she did not attend all of the meetings. Pl. Resp. SUMF ¶¶ 43, 46, 47. This undermines any argument that there was a pattern of excluding Plaintiff from relevant humanities initiatives.

Regarding training for remote teaching and Plaintiff's argument that she was "iced-out" by her colleagues regarding remote teaching during the COVID-19 pandemic, these events appear to have occurred within the limitations period. It is undisputed, however, that, after almost three months, Plaintiff received training from Gay. Pl. Resp. SUMF ¶ 51-55. Plaintiff takes the position that this training was not what she requested, *id*. at ¶ 55, but even viewing the evidence in the light most favorable to her, no reasonable jury could conclude that a delay over the summer during the COVID-19 pandemic responding to Plaintiff's request and the training's focus on technology, not

15

pedagogical technique, contributed to a hostile work environment. Similarly, even viewing evidence that Plaintiff's colleagues did not respond to her questions about online teaching during the COVID-19 pandemic in the light most favorable to Plaintiff, no reasonable jury could conclude that contributed to a hostile work environment where Plaintiff received training from Gay.

Regarding Plaintiff's argument that she "was forced to sit on a personnel committee led by [Tagg] in violation of past assurances from a Binghamton administrator," even viewing the evidence in the light most favorable to Plaintiff, the cited evidence does not support her argument. As an initial matter, the cited evidence does not offer any support that a Binghamton administrator assured her that she would not have to sit on personnel committees with Tagg. In addition, the cited evidence establishes only that in January 2021, Um agreed that a personnel committee should be formed and that Tagg would be the Chair. Barzman Tr. at 90:15-92:11. It does not establish that such a committee was actually convened or met before Plaintiff's departure. *Id.* It also does not offer any support for Plaintiff's assertion she was "forced to sit on a personnel committee led by" Tagg. As a result, even assuming that Um agreed that Tagg could chair a personnel committee in 2021, Plaintiff has not offered sufficient evidence for a reasonable jury to conclude that this action was sufficiently severe to contribute to a hostile work environment.

Although Plaintiff does not mention or cite to a 2019 personnel committee chaired by Tagg in her statute of limitations argument, the University argues that Plaintiff did not provide proof that "her voluntary participation in this committee rose to the level of a violation of the law."[4] Pl. MOL

---

[4] The parties do not offer any specific evidence about the dates for this personnel committee other than the spring of 2019, and that semester includes dates both before and after April 18, 2019. Given that the statute of limitations is an affirmative defense, the University has not offered any evidence regarding the date of that decision, and the University does not argue that it is untimely, the Court will assume that this action occurred within the limitations period. *See McGullam,* 609 F.3d at 76 (explaining that where Plaintiff did not date an incident, defendant "ha[d] not tried to find out whether [plaintiff] can date the incident," and given that "the statute of limitations is an

at 13 (citing Dkt. No. 11 at 7-8); Reply at 9.  According to Plaintiff, Tagg gave her "a marginal committee assignment, scheduled meetings with disregard go her other commitments, and her suggestions and concerns were summarily rejected."  Pl. SUMF ¶ 40.  But Plaintiff has not explained how "a marginal committee assignment," not adequately considering Plaintiff's schedule for meetings, and rejecting her concerns were acts severe enough to contribute to an environment "permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [her] educational environment."  *Papelino,*  633 F.3d at 89 (quotation omitted).  As a result, Plaintiff has not offered sufficient evidence for a reasonable jury to conclude that Plaintiff's involvement with a personnel committee in the spring of 2019 was sufficiently severe to contribute to a hostile work environment.

Even assuming, however, that allowing Tagg to chair a personnel committee was a discriminatory act that contributed to a hostile work environment, allowing Tagg to chair personnel committees in 2019 and 2021 would only be a "hook" for "sufficiently related" conduct. *Sanderson v. New York State Elec. & Gas Corp.*, 560 F. App'x 88, 91 (2d Cir. 2014).  Applying the factors identified in *Ball,* 627 F. Supp. 3d at 314-15, to the 2019 and 2021 personnel committee actions (2019/2021 committee actions), the incidents occurred in the same environment, that is the Department, and there was no intervening action by the employer.  In addition, the alleged harasser was the same.  On the other hand, Plaintiff has not offered any evidence that the 2019/2021 committee actions involved "intimidation, ridicule, and insult."  *Papelino,* 633 F.3d at 89 (quotation omitted).  Even assuming that a reasonable jury could conclude that during personnel committee meetings generally, Tagg talked over her, laughed at her, and raised his voice at her, Pl.

---

affirmative defense," plaintiff's "submissions arguably allege that the [incident] was made within" the relevant time period).

SUMF ¶ 55, those actions are common in workplaces, and are not generally actionable. *McGullam,* 609 F.3d at 76 (explaining that "Title VII simply 'does not set forth a general civility code for the American workplace.'"). As far as the frequency of conduct, Plaintiff has not offered evidence that Tagg chaired a personnel committee from 2015 through 2018.[5] This means that four years passed between the 2014 and 2019 committees.

In addition, even viewing the evidence in the light most favorable to Plaintiff, the most recent examples of conduct by Tagg that Plaintiff found abusive occurred in 2014 when (1) after a faculty meeting, Tagg stood between Plaintiff and her office door and "verbally abused" her, but Plaintiff does not remember what Tagg said, and Tagg did not touch her; Barzman Dep. at 65-68; and (2) Tagg "tried to intimidate" her and "became extremely angry and menacing" when Plaintiff "tried to stand up for herself," *id.* at ¶ 32. The four-year gap between those actions and the 2019/2021 committee actions indicates that the conduct was not particularly frequent. *See Sanderson*, 560 F. App'x at 92 (no continuing violation where there was a two-year gap between incidents of alleged harassment committed by different, unrelated perpetrators); *see also McFarlane v. Cmty. Health Ctr. of Richmond, Inc.*, No. 25-cv-410, 2025 WL 3625900, at *6 (E.D.N.Y. Dec. 15, 2025) ("The lack of temporal proximity between plaintiff's January 2024 termination and the May 2022 incidents also weighs against concluding that the continuing violation doctrine applies.").

Finally, the 2019/2021 committee actions were much less severe than the 2014 actions, and even the 2014 actions—a single incident involving "verbal abuse" and another incident where

---

[5] Plaintiff does not explicitly state that Tagg chaired a personnel committee in 2014, but viewing the evidence in the light most favorable to her, that is a reasonable inference from her statement that he inserted himself into her review of an assistant professor where that review as part of a committee assignment. Pl. SUMF ¶ 32.

Tagg "tried to intimidate" her and "became extremely angry and menacing," Barzman Dep. at 100-02; Pl. SUMF at ¶ 32—were not extremely severe compared to the explicitly physically threatening, and humiliating actions typically required for hostile work environment claims. *See Littlejohn,* 795 F.3d at 323; *Ball,* 627 F. Supp. 3d at 315 ("the more similar the incidents are in severity, the more likely it is that the incidents are related under *Morgan*") (quoting *McGullam,* 609 F.3d at 78 n.5). In sum, this "individualized assessment" indicates that the 2019/2021 committee actions are not related to the 2014 conduct.

Plaintiff also offers evidence of incidents that occurred before 2014, and viewing the evidence in the light most favorable to her, Tagg was "physically violent and abusive" during their romantic relationship including six years, 1999 to 2005, when they both worked at the Department. Pl. Resp. SUMF ¶¶ 2, 4, 15. Even assuming that Tagg was "physically threatening or humiliating," *Littlejohn*, 795 F.3d at 323 (quotation omitted), this period ended nine years before the 2014 actions. Further, the specific facts that Plaintiff offers for the period immediately after her relationship with Tagg ended—that in 2005 or 2006, Tagg "accoste[ed]" Plaintiff after 5:00 p.m., raised his voice, became red in the face, and demanded that she return the engagement ring," and that he yelled at her "each time she passed by his office," Barzman Dep. at 100-02, Pl. SUMF at ¶17—are the most severe that she offers, and they are not extremely severe.

Regarding Plaintiff's argument that she was "forced to endure a toxic workplace culture," she relies on her March 24, 2021 email to Baker stating that Tagg "established a toxic workplace culture in which I continue to be re-victimized to this day." Pl. MOL at 26 (citing Pl. SUMF ¶ 139). This conclusory statement is not sufficient to create a genuine disputed material fact because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010)

(quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)); *see also Livingston v. City of New York*, 563 F. Supp. 3d 201, 255 n. 37 (S.D.N.Y. 2021) (concluding that Plaintiff's statements that his supervisors were "like a fraternity" and that he "felt a lot of animosity from all of them" were too conclusory to support a hostile work environment claim).

There are two other potentially timely actions discussed in the submissions, but not addressed in Plaintiff's statute-of limitations argument. First, Plaintiff asserts that her name was omitted from a list of faculty members on the bulletin board outside the Department's main office in November of 2021, until a "[a] few months later," and even then she was not identified as "faculty." Pl. SUMF ¶¶ 50, 51. It is not disputed that at that time, Plaintiff had "no departmental responsibilities other than completion of her two remaining doctoral students." Def. SUMF ¶ 93; Pl. Resp. SUMF ¶ 93; Pl. SUMF ¶ 198. In addition, Plaintiff has not explained how this act was motivated by sex or how it "unreasonably interfere[d] with [her] work performance." *Littlejohn,* 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris,* 510 U.S. at 23). As a result, on this record, the omission of her name and later her title from the bulletin board is not sufficient for a reasonable jury to conclude that this was a discriminatory act or that it was sufficiently severe to contribute to a hostile work environment.

Second, Plaintiff made complaints to both Klin and Baker in 2021. The parties do not dispute that January 2021 was the first time that Plaintiff notified Klin of her allegations regarding Tagg's domestic abuse, and this was within the Title IX limitations period. Pl. Resp. SUMF ¶ 57. They also do not dispute that Klin communicated with Plaintiff and drafted an MOU before Plaintiff unilaterally withdrew from the process, *id*. at ¶¶ 59-64, 67, 72-76, and that Baker communicated with Plaintiff before she began discussing her departure. *Id*. at ¶¶ 79-80; Pl. SUMF ¶¶ 139-43. Given these actions by Klin and Baker, even viewing the evidence in the light most

20

favorable to Plaintiff, there is not sufficient evidence for a reasonable jury to find that the University had an ongoing practice or policy of ignoring Plaintiff's requests during the limitations period. *See Purcell,* 931 F.3d at 65.

To the extent Plaintiff argues that Klin's response was insufficient, she has not explained how the response amounted to deliberate indifference or how it was clearly unreasonable under the known circumstances. *Papelino,* 633 F.3d at 89. Viewing the evidence in the light most favorable to Plaintiff, she reported information about Tagg and the Department between approximately 2003 and 2015, but her first report to Klin did not occur until 2021, approximately six years later. Pl. SUMF ¶¶ 91-113; Pl. Resp. SUMF ¶ 57. This evidence is not sufficient for a reasonable jury to conclude that there was an ongoing practice or policy to discriminate against Plaintiff on the basis of sex.[6] Pl. SUMF ¶¶ 91-115. *See Sanderson*, 560 F. App'x at 92 (no continuing violation where there was a two-year gap between incidents of alleged harassment committed by different, unrelated perpetrators); *see also McFarlane*, 2025 WL 3625900, at *6 ("The lack of temporal proximity between plaintiff's January 2024 termination and the May 2022 incidents also weighs against concluding that the continuing violation doctrine applies.").

Given that the continuing violation doctrine does not apply, untimely conduct may be considered only as "background evidence" to provide context for the timely conduct. *See Ramirez v. New York Presbyterian Hosp.*, 129 F. Supp. 2d 676, 680 (S.D.N.Y. 2001) (Title VII) (quoting

---

[6] Plaintiff asked to be transferred to a different department more than once in 2014, but she did not make that request in her 2015 and 2016 emails. Pl. SUMF ¶¶ 104-112; Dkt. Nos. 75-9 and 75-42. In 2017, Plaintiff floated the possibility of transferring to an office in the University Art Museum in an email to the museum director, and, viewing the evidence in the light most favorable to Plaintiff, the Dean of Harpur College refused to meet with her in 2017 and 2018. Pl. SUMF ¶ 122-23. Even viewing the evidence in the light most favorable to Plaintiff, neither the dean's failure to meet with Plaintiff nor the email to the museum director appears to be a transfer request.

21

*United Air Lines v. Evans,* 431 U.S. 553, 558 (1977)); *Berger v. Port Auth. of N.Y. and N.J.*, 150 F. Supp. 2d 504, 507 (E.D.N.Y. 2001) (Title IX).

Even considering untimely conduct as background evidence providing context for the arguably timely actions—the 2019/2021 committee action, the 2021 responses from Klin and Baker, and the omission of her name from the bulletin board—and viewing them in the light most favorable to Plaintiff, Plaintiff has not offered sufficient evidence that they were severe or pervasive enough for a reasonable juror to conclude that they support a hostile work environment claim.  *See Papelino*, 633 F.3d at 89 (requiring that the environment be "objectively hostile or abusive"); *Littlejohn*, 795 F.3d at 321 (same).  Defendants' motion for summary judgment on the hostile work environment claim arising under Title IX is therefore granted.

### b.  Title VII Hostile Work Environment Claim

"Title VII requires that individuals aggrieved by acts of discrimination [in states like New York] file a charge with the EEOC within . . . 300 days 'after the alleged unlawful employment practice occurred.'"  *Reppert v. New York State Dep't of State*, No. 19-cv-1518 (BKS), 2022 WL 2315603, at *6 (N.D.N.Y. June 28, 2022) (quoting *Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72, 78-79 (2d Cir. 2015).  In addition, federal charges must be brought within 90 days of receiving a right to sue letter.  *DeJohn v. Wal-Mart Stores East, LP*, No. 9-cv-1315 (GTS), 2013 WL 1180863, at *3 (N.D.N.Y. Mar. 20, 2013).  Plaintiff filed her second discrimination charge with the EEOC on September 14, 2022, received notice of right to sue on September 20, 2023, and moved to amend the complaint to include Title VII claims on November 17, 2023.  Am. Compl. ¶ 13.  The statute of limitations date for Plaintiff's Title VII claims is therefore November 18, 2021.

Plaintiff does not date any of the acts identified in her statute of limitations argument as within the Title VII limitations period, and none of the supporting citations indicate that any of

those acts occurred within the limitations period.  Pl. MOL at 26.  As discussed above, however, there is evidence in the record that Plaintiff's name was omitted from a bulletin board for a few months and when her name was added, her title was not added.  Pl. SUMF ¶¶ 50, 51.  For the same reasons explained above, on this record, the omission of her name and later her title from the bulletin board is not sufficient for a reasonable jury to conclude that this was a discriminatory act or that it was sufficiently severe to contribute to a hostile work environment.

As a result, even viewing the evidence in the light most favorable to Plaintiff, there are no discriminatory acts to support a Title VII claim or to apply the continuing violation exception.

### 2.  Retaliation

Defendant argues that Plaintiff's retaliation claims should be dismissed because Plaintiff fails to provide evidence that she ever complained of sex-based discrimination and fails to point to any adverse action connected to protected activity.  Def. MOL at 17-18.  Plaintiff responds that she engaged in protected activity in 2021 and 2014 when she reported sex-based discrimination to University administrators and that the University took an adverse action against her when "she was forced to leave [the University] because of Defendants' misconduct and inaction."  Pl. MOL at 19-21.

"To make out a *prima facie* case for Title VII retaliation, a plaintiff must show 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action."  *Dotson v. City of Syracuse*, 688 F. App'x 69, 72 (2d Cir. 2017) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (additional quotation omitted) (cleaned up)).  "As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2)

knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action." *Papelino*, 633 F.3d at 91.

Regarding the first and second factors, for purposes of this motion, the Court assumes that there is sufficient evidence for a reasonable jury to conclude that Plaintiff's 2014 and 2021 reports to University administrators were protected activity, and that the University was aware of this protected activity. Pl. MOL at 19-20. Regarding the third factor, retirement and resignation may be adverse actions for a retaliation claim if the action is a constructive discharge. "The standard for constructive discharge is whether 'working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 311 (S.D.N.Y. 2009) (quoting *Pa. State Police v. Suders,* 542 U.S. 129, 141 (2004)). In other words, "'[c]onstructive discharge occurs when an employer *deliberately* makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Id.* at 311-12 (quoting *Kader v. Paper Software, Inc.,* 111 F.3d 337, 339 (2d Cir. 1997)). A plaintiff alleging constructive discharge must demonstrate that "the employer's actions were deliberate and not merely negligent or ineffective." *Petrosino v. Bell Atl.*, 385 F.3d 210, 230 (2d Cir. 2004) (quotation omitted) (cleaned up). The standard for "intolerable" working conditions is a higher bar than that for a hostile work environment claim. *See Ferraro v. Kellwood Co.*, No. 03-cv-8492, 2004 WL 2646619, at *7 (S.D.N.Y. Nov. 18, 2004) ("Constructive discharge can be seen as an aggravated case of hostile work environment.").

Given that Plaintiff has not satisfied the standard for a hostile work environment claim, she has not satisfied this higher bar for a constructive discharge. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010) ("Because [plaintiff] failed to establish a hostile

24

work environment, her claim of constructive discharge also fails.") (42 U.S.C. § 1981 retaliation claim); *see also Antrobus v. New York City Health & Hosps. Corp.*, No. 21-891, 2023 WL 6784414 at *3 (2d Cir. Oct. 13, 2023) ("Appellant's failure to state a claim for hostile work environment necessarily renders her constructive discharge claim—which is predicated on the same allegations as the hostile work environment claim—unsuccessful.") (ADEA retaliation claim) (citing *Fincher*, 604 F.3d at 725). Defendants' motion on Plaintiff's Title VII and Title IX retaliation claims is therefore granted.

### B. NYSHRL

With all federal claims dismissed, the Court must determine whether to exercise supplemental jurisdiction over the remaining state law claims. "A district court may decline to exercise supplemental jurisdiction over pendent state law claims if it has dismissed all claims over which it has original jurisdiction." *Allen v. City of New York,* No. 24-2589-cv 2025 WL 3152723 at *2 (2d Cir. 2025) (citing 28 U.S.C. § 1367(c)(3)). Indeed, the district court "may (and indeed ordinarily should) kick the case to state court." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 32 (2025) (citing *Mine Workers v. Gibbs*, 383 U.S. 715, 726-27 (1966)). "When deciding whether to exercise jurisdiction over pendent state law claims, courts weigh the factors of 'judicial economy, convenience, fairness, and comity.'" *Allen,* 2025 WL 3152723, at *2 (quoting *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 357 n.7 (1988), *abrogated on other grounds by Wullschleger*, 604 U.S. at 32); *see also Kolari v. New York–Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir. 2006) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting *Cohill,* 484 U.S. at 357 n.7 (1988)).

25

Regarding Plaintiff's NYSHRL claim relying on the existence of a hostile work environment, historically "claims brought under [the NYSHRL] were analytically identical to claims brought under Title VII." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011) (citations and quotation marks omitted). However, "[i]n August 2019, the NYSHRL was amended to eliminate the 'severe or pervasive' standard for such claims." *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 334 n.9 (S.D.N.Y. 2020). Because Plaintiff's NYSHRL hostile work environment claim is based on conduct occurring both before and after October 11, 2019, the "'more permissive [standard], omitting the requirement that the complained-of conduct be severe or pervasive,'" may apply to some of the Defendants' alleged misconduct. *Friederick v. Passfeed, Inc.*, No. 21-cv-2066, 2022 WL 992798, at *6 (S.D.N.Y. Mar. 31, 2022) (quoting *Moazzaz v. MetLife, Inc.*, 2021 WL 827648, at *8 (S.D.N.Y. Mar. 4, 2021)). Because these claims would require the application of a different standard than the one applied to issues already decided by this Court, interests of comity weigh strongly in favor of declining to exercise supplemental jurisdiction. *See Sunnen v. New York State Dept. of Health,* 544 Fed. App'x 15, 17 (2d Cir. 2013) (vacating district court decision to dismiss "state-law claims against a state agency that were removed to District Court pursuant to the Court's pendent removal jurisdiction" and remanding for the district court to remand those claims to state court) (quoting *Naylor v. Case & McGrath, Inc.,* 585 F.2d 557, 562 (2d Cir.1978)); *id.* ("concerns of comity and of federalism . . . encourage remanding to the state courts cases in which state court adjudication can properly claim primacy of interest.") (quoting *Naylor,* 585 F.2d at 562)); *Sunnen v. New York State Dept. of Health*, No. 12 Civ. 3417, 2012 WL 6645942 at *2-3 (S.D.N.Y. Dec. 21, 2012) (explaining that the state-law claims included NYSHRL claims).

The NYSHRL also allows for liability against individuals on an "aiding and abetting" theory of liability.  N.Y. Exec. Law § 296(6).  NYSHRL aiding and abetting liability is derivative of underlying discrimination liability.  *See Falchenberg v. N.Y.S. Dept. of Educ.*, 338 F. App'x 11, 14 (2d Cir. 2009); *see also Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 344 (S.D.N.Y. 2009); *Jain v. McGraw-Hill Cos., Inc.*, 827 F. Supp. 2d 272, 277 (S.D.N.Y. 2011), *aff'd*, 506 F. App'x 47 (2d Cir. 2012) ("liability must first be established as to the employer/principal before accessorial liability can be found as to an alleged aider and abettor.").  Because the Court declines to exercise supplemental jurisdiction over the underlying NYSHRL discrimination claim, the Court similarly declines to exercise supplemental jurisdiction over Plaintiff's claims against individual defendants for aiding and abetting discrimination.

NYSHRL retaliation claims are subject to a more lenient standard than federal law.  The NYSHRL "does not require that the plaintiff prove any adverse employment action[;] [i]nstead, [plaintiff] 'must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity.'"  *Ringel v. New York City Dep't of Educ.*, 616 F. Supp. 3d 205, 241 (E.D.N.Y. 2022) (quoting *Adams v. City of New York*, 837 F. Supp. 2d 108, 128 (E.D.N.Y. 2011)) (additional quotation omitted).  The NYSHRL also allows for retaliation liability against individuals.  *See* N.Y. Exec. Law § 296(7); *see also Nezaj v. PS450 Bar & Rest.*, 719 F. Supp. 3d 318, 330 (S.D.N.Y. 2024) ("although the NYSHRL does not provide for direct liability for discrimination other than by an 'employer,' it makes it unlawful for 'any person' to retaliate.") (citing *Everett v. N.Y.C. Dep't of Educ.*, No. 21 Civ. 7043, 2023 WL 5629295 at *11, *14 (S.D.N.Y. Aug. 31, 2023)).  Because these claims would require the application of a different standard than the one applied to issues already decided by this Court, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL retaliation claims for the same reasons explained above.

27

Finally, declining to exercise supplemental jurisdiction over the NYSHRL claims would not prejudice the parties because they will have the benefit of the discovery and legal arguments from this case if Plaintiff brings an action in state court.  Furthermore, Plaintiff would not be prejudiced because the statute of limitations for bringing NYSHRL claims in state court has been tolled while the claims in this case were pending plus 30 days.  *See* 28 U.S.C. § 1367; *see also Artis v. D.C.*, 583 U.S. 71 (2018).

For these reasons, the Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims against the University and the individual Defendants and dismisses them without prejudice.

## IV.      Conclusion

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment under Rule 56, Dkt. No. 66, is **GRANTED** as to Plaintiff's Title VII and Title IX claims against all Defendants, and those claims are dismissed with prejudice; and it is further

**ORDERED** that Plaintiff's New York State Human Rights Law Discrimination and Retaliation claims against all Defendants are **DISMISSED** without prejudice; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment accordingly and close the case.

**IT IS SO ORDERED.**

Dated: March 31, 2026

_____
Elizabeth C. Coombe
U.S. District Judge